UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

ESTATE OF DAVID COTTON               CIVIL ACTION NO.

                                     3:01CV01203(AVC)

V.

RICHARD J. BOWEN IV,
JEFFREY ANGELL, DANIEL SQUIRES,
AND TOWN OF WINDSOR LOCKS            MARCH 23, 2003

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Nature of Plaintiff's Claims:

The Plaintiff, as duly appointed Administrator for the Estate of David Cotton,

asserts that the three defendant officers, while acting under color of state law, engaged in

a series of unnecessary and excessive actions, inflicted upon a custodial detainee. These

unnecessary and excessive actions, in their cumulative effect, were a substantial factor in

causing David Cotton's death. Plaintiff contends that these unnecessary and excessive

actions violated David Cotton's rights under the 4th and 14th Amendments to the United

State Constitution;  42 USC Sections 1983 and 1988; Sections 7 and 9 of the Connecticut

Constitution. Plaintiff also asserts a state based cause of action sounding in common law

negligence. The claim of vicarious liability against the Town of Windsor Locks is based

upon provisions of CGS 7-465 which waive Sovereign Immunity and require "Any

town...notwithstanding any inconsistent provision of law, .... (to) pay .... all sums ... by

HUNT LEIBERT CHESTER & JACOBSON, P.C. ● ATTORNEYS AT LAW
50 WESTON STREET  ●  HARTFORD, CONNECTICUT 06120  ●  (860) 808-0606  ●  JURIS NO. 101589

reason of the liability imposed ... for damages awarded for infringement of any person's civil rights or for physical damages to person ...".

Plaintiff's Statement of Facts: (The source materials cited and relied upon for this section of the brief, come from: depositions taken of the three defendant officers and two ambulance attendants; reports and voluntary statements provided by said deponents; two filed ambulance run sheets; the Hartford Hospital emergency room report; and the Medical Examiner's report)

**Setting:** September 21st, 2000, the Defendants Bowen, Angell and Squires were on duty as police officers, and acting within the scope of their employment for the Town of Windsor Locks[1]. (*Def's 9(c) #6; App* 1B ). Bowen, at 12:48 am, the morning of 9/21/2000, pulled into the parking lot of an establishment, situated within the Town of Windsor Locks, known as the Motel 6. (*B's rep*, p 2, 1st paragraph; *App* 6B ). The Motel 6 has a reputation for drug activity. (*Def's 9(c) #11; App* 1B ). Bowen observed a van, parked, with the engine running. David Cotton, was in the driver's seat with his eyes closed. Bowen observed several small white pieces of powder on the front of David Cotton's shirt. (*B's rep*, p 2, 2nd paragraph; *App* 6B ). Bowen thought that the white specks were narcotics. (*B, p* 16, *ll* 19-23; *App* 5A ) . Bowen interpreted Cotton's appearance as the display of one who had been snorting cocaine. (*B, p* 25, *ll* 8-13; *App* 5B ). Bowen could not tell if Mr. Cotton was asleep or passed out. (*B's rep*, p 2, 2nd paragraph; *App* 6B ).

---

[1] **Abbreviations employed in this Memorandum:** *Def's 9(c)* = Defendants' 12/30/02 Local Rule 9(c)(1) Statement; *Ak* = deposition of Stanley Akesson; *Ak's rep* = Akesson's 3 page voluntary statement dated 9/21/00; *Zim rep* = 4 page voluntary statement of Kelly Ann Zimmer dated 9/21/00; *B* = deposition of Richard Bowen; *B's rep*= Bowen's police report; *B's Cap* = Bowen's report justifying use of capstun; *Ang* = deposition of Jeffrey Angell; *Ang's rep* = Angell's police report; *S* = deposition of Daniel Squires; *S's rep* = Squires police report; *R's rep* = Sgt Rachele's 4 page police report; *HH* = Hartford Hospital; *ME rep*

Bowen aroused Cotton through a combination of knocking on the driver's side window and the employment of flashlight illumination. (*B's rep*, *p* 2, 2nd paragraph; *App* 6B ). Cotton was then observed holding a lighter in one hand and a cigarette in the other. Cotton, upon arousal, was observed reaching into the center of the van. Bowen inquired, "What are you doing?" Cotton replied, "Looking for a lighter." (*B*, *p* 36, *ll* 4; *App* 5C ). Bowen concluded that Cotton's behavior exhibited the nervousness and mental confusion consistent with one who had been using drugs. (*B*, *p* 40, *ll* 15-18; *App* 5D ). Bowen ordered Cotton out of the van as Angell arrived on the scene. (*B's rep*, *p* 2, 4th paragraph; *App* 6B ). Bowen conducted a patdown. The patdown procedure required Cotton to place both hands on top of the van and spread his feet apart. The scope of patdown went from Cotton's wrists to his ankles. (*B*, *p* 43, *ll* 19 - 23; *App* 5E ). The patdown involved feeling Cotton's arms, armpits, front of shirt, groin area, legs and socks to verify the absence of concealed weaponry. (*B*, *p* 44, *ll* 3-6; *App* 5F ). There was no weaponry but Bowen discovered about $5,000 in Cotton's right front pants pocket. (*B's rep*, *p* 2, 4th paragraph; *App* 6B ).

**Ingestion of additional drugs**: Bowen asked Angell to keep an eye on Cotton so that a van search could be carried out. (*B's rep*, *p* 2, 4th paragraph; *App* 6B ). Bowen, during the course of his search, leaned out of the van and silently mouthed to Angell, "did you see that?" (*Ang*, *p* 80, *ll* 16-22; *App* 8D ). Bowen informed Angell, "He put something in his mouth." (*Ang*, *p* 80, *ll* 23; *App* 8D; *p* 90, *ll* 24-25; *App* 8K ). Bowen came out of the van and directed Cotton to spit out whatever was in his mouth. (*Ang*, *p* 82, *ll* 2-3, 9-11; *App* 8E ). Bowen knew that Cotton had something in his mouth. (*B*, *p* 55, *ll* 12; *App* 5H

= Medical Examiner's 6 page Post Mortem Report. Emergency Record; Page and line references from the various depositions are respectively identified as *p* and *ll*. *App* = appendix.

HUNT LEIBERT CHESTER & JACOBSON, P.C. ● ATTORNEYS AT LAW
50 WESTON STREET ● HARTFORD, CONNECTICUT 06120 ● (860) 808-0606 ● JURIS NO. 101589

). Angell knew that Cotton had something in his mouth, because his attempts to communicate were muffled. (*Ang*, p 82, *ll* 11-12; *App* 8E ). Angell knew that Cotton's denial of having ingested drugs was false. (*Ang*, p 127, *ll* 5-8; *App* 8Y ). Angell's experience had taught him that he could not rely on what a drug suspect said. (*S*, p 154, *ll* 4-21; *App* 10LL ).  Bowen believed that Cotton had drugs in his mouth. (*B's rep*, p 2, 5th paragraph; *App* 6B ). Bowen felt that the nature of the drug, Cotton had in his mouth, was crack cocaine. (*B's cap*; *App* 7A ). Bowen, at a later point in the evening, told Squires of having observed bits of "crack" on Cotton's tongue. (*S*, p 152 *ll* 22-25 thru *App* 10GG; *p* 153, *ll* 1-5; A*pp* 10HH ).  Angell remembered observing that Cotton had white rock like substance in his mouth. (*Ang*, p 126, *ll* 23-25; *App* 8X ). Angell recalled telling Squires of having observed drug chunks in Cotton's mouth. (*Ang*, p 135, *ll* 12-14; *App* 8BB ).

Bowen felt, based upon his experience and training, that Cotton was trying to destroy drug evidence. (*B*, p 61, *ll* 2-5; *App* 5K ). Bowen wanted to get Cotton to spit out the drugs that were in his mouth. (*S*, p 50, *ll* 13-20; A*pp* 10F ).  Bowen felt that the only way to access Cotton's mouth was to get him on his knees. (*Ang*, p 83, *ll* 23-25 thru *App* 8F ; *p* 84, *ll* 1; *App* 8G ). Bowen suggested to Angell that Cotton be put on his knees so that a "better look" could be had. (*B*, p 60, *ll* 20-22, 24; *App* 5J ). Angell and Bowen then brought Cotton to his knees. (*B*, p 58, *ll* 15-16, 18-19; *App* 5I ). Angell retrieved his attack trained dog, Niko, at this point in time. (*Ang*, p 82, *ll* 13; *App* 8E ). Bowen tried to get Cotton to open his mouth and he would not. (*S*, p 51, *ll* 12-22; A*pp* 10G ). After Niko bit, Cotton screamed out. (*Ang*, p 114, *ll* 24-25; *App* 8Q ). A piece of something flew out of Cotton's mouth and landed on Bowen's arm. (*Ang*, p 115, *ll* 1-2; *App* 8R ). What landed on Bowen's arm was a white chunk; a hard white substance about half the size of

a pinky nail. (*Ang*, p116, *ll* 24-25 thru *App* 8S; p 117, *ll* 6; *App* 8T ). Bowen knew the chunk Cotton spit out was not all that had been in Cotton's mouth because, he later told Squires that, Cotton had swallowed drugs. (*B*, *p* 78, *ll* 22-23; *App* 5U;  p 80, *ll* 2; *App* 5W ). Bowen clarified that he knew the difference between merely concealing something in the mouth and swallowing what was once concealed in the mouth. (*B*, *p* 79, *ll*  16-19; *App* 5V ). Bowen later admitted to an ambulance attendant that Cotton had been observed swallowing bags of crack. (*Ak*, p 52, *ll* 4-22; *App* 2O ). The dispatcher at the Windsor Locks police department called for an ambulance based upon Squires' report that Cotton "swallowed quite an amount of crack and then went into a seizure." (*S*, *p* 171, *ll* 10-25; *App* 10II; p 178, *ll* 15-18; *App.* 10JJ ). Bowen was the only Windsor Locks police officer to arrive at Hartford Hospital with Cotton. (*B*, *p* 83, *ll*  6; *App* 5Y ). Upon arrival at the Hospital, Bowen spoke with the triage nurse. (*B*, *p* 82, *ll*  22; *App* 5X ). The information the triage nurse received concerning the Motel 6 scene could only have come from Bowen. (*B*, *p* 83, *ll*  16-20; *App* 5Y ). The triage nurse quoted Bowen as having observed Cotton "put something in his mouth". The triage nurse reported that Bowen tried to retrieve whatever Cotton had put in his mouth but that "patient swallowed contents. Became unresponsive within minutes." (*HH*, *p* 1; *App* 13A ).

**Express acknowledgment of need to secure medical care:** Defendant Squires, upon arrival at the Motel 6,  noticed that Cotton's face was lathered in sweat even though it was not hot outside. (*S*, *p* 78, *ll*  8-9; *App* 10O; p 80, *ll*  20; *App.* 10Q ). Squires acknowledged that sweating was one of the signs consistent with the presence of drug overdose. (*S*, *p* 79, *ll*  10-13; *App.* 10P ). Angell acknowledged knowing that ingested narcotics can be lethal and require evaluation. (*Ang*, p 129, *ll* 1-4; *App* 8Z ).  Angell

recalled having a concern, while yet at the Motel 6 scene, that Cotton should be brought

to a hospital. (*Ang*, p 188, *ll* 5-7; *App* 8KK ). Angell recalled that this concern was a topic

of conversation. (*Ang*, p 189, *ll* 5-10; *App* 8LL ). Angell remembered that all three

defendants were parties to this conversation.  (*Ang*, p 189, *ll* 11-13; *App* 8LL ). Angell

recalled that it was either Bowen or Squires who mentioned that Cotton would probably

be going to the hospital. (*Ang*, p 189, *ll* 9-13; *App* 8LL ).

**Relevant Police Training and Clinical Experience**:  Police academy training identified

what cocaine and crack were. (*S*, *p* 62, *ll* 13-17; A*pp* 10H ). Cocaine covers a spectrum of

potency based upon how many times it might have been "stepped on" or diluted. (*Ang*, p

77, *ll* 20-24; *App* 8B ). Crack is a derivative of cocaine. It is stronger than cocaine. (*Ang*,

p 75, *ll*  17-24; *App* 8A ). The academy training identified some of the toxic dangers that

crack and cocaine presented to users. (*S*, *p* 62, *ll* 18-20; A*pp* 10H ). The training

identified that there is a correlation between the amount of drugs used and the risk of

harm to the user. (*S*, *p* 62, *ll* 25 thru A*pp* 10H; *S*, *p* 63, *ll* 1-4; *App* 10I ). The correlation

identified by academy training held that the more drugs which are consumed, the greater

the risk of harm to the user. (*S*, *p* 64, *ll* 10-14; *App* 10J ).

Academy training and field experience would identify at least three

considerations, based upon Mr Cotton's appearance, at the time he was observed by

Bowen: (a) drugs had been ingested; (b) the amount of drugs ingested was unknown. (*S*,

*p* 67, *ll* 1-6; A*pp* 10K ) and (c) the potency of the drug ingested could not be determined

simply from observation of the powder on the shirtfront. (*Ang*, p 77, *ll* 25 *App* 8B thru *p*

78, *ll* 1-3; *App* 8C ).

The academy taught that drug ingestion could produce a toxic effect on the swallower. (*B, p* 131, *ll* 8-13; *App* 5HH ). A combination of academy training and field experience, taught the defendant officers that persons observed swallowing cocaine should be given medical attention. (*B, p* 131, *ll* 4-23; *App* 5HH ). The defendant officers knew, at the time of responding to the Motel 6 scene, that medical help should be summoned for someone **who is suspected** of swallowing cocaine because it could be fatal. (*B, p* 132, *ll* 19-23; *App* 5II; *S, p* 64, *ll* 15-19; *App* 10J )(**emphasis supplied**). The officers knew, before arriving at the Motel 6 scene, that an ambulance was available if it was needed. (*B, p* 132, *ll* 2-4; *App* 5II ). An ambulance was called because there are EMT's on an ambulance with a higher level of medical training than is possessed by a police officer. (*Ang, p* 186, *ll* 8-16; *App* 8JJ ). If Bowen failed to act on a recognized need for an ambulance then the responsibility fell upon Squires, as the supervising officer. (*S, p* 82, *ll* 6-11; *App* 10R ).

**Defendants' decision to delay summoning medical help:** Bowen field tested the substance that Cotton spit out, after being bitten. (*Ang, p* 117, *ll* 16-18; *App* 8T ). Conduct of the field test was a matter of seconds. . (*B, p* 63, *ll* 7-9, 17-18; *App* 5M ). Cotton was determined to be in possession of crack cocaine. . (*S, p* 181, *ll* 4-12; *App* 10KK; *R's rep, p* 1 of 4, 2d par; *App* 12A ). Bowen made the decision to arrest Cotton. (*Ang, p* 149, *ll* 18-21; *App* 8DD; p 139, *ll* 2-3; *App* 8CC; *S, p* 42, *ll* 2-4; *App* 10C ). Arrest, in this context, meant the cuffing procedure. (*Ang, p* 124, *ll* 24-25; *App* 8V). Bowen handcuffed Cotton. (*Ang, p* 118, *ll* 11; *App* 8U ). Cotton remained cuffed for all times thereafter until after he went into seizure and the ambulance attendants arrived at the Windsor Locks police department. (*B, p* 77, *ll* 1-4; *App* 5T ).There was never a time while Cotton was

handcuffed that he would have been able to place drugs in his mouth. (*S, p* 72, *ll* 24-25; *App* 10L thru *p* 73, *ll* 1-3; *App* 10M ).

When Squires arrived on the Motel 6 scene, Bowen and Angell were standing by Cotton who had been handcuffed behind his back. (*S, p* 24, *ll* 20-25; *App* 10B ). Squires could not be clear whether he had remained on the Motel 6 scene more or less than one half hour after arrival. . (*S, p* 82, *ll* 19-25; *App* 10R thru *p* 83, *ll* 1-4; *App* 10S ) There is nothing in the dispatch log that identifies the time when Cotton was removed from the Motel 6 scene. (*Ang, p* 130, *ll* 4-7, 14-23; *App* 8AA ). The decision to remove Cotton from the Motel 6 scene to the Police Department was made by Squires and Bowen. (*S, p* 77, *ll* 5-7; *App* 10N; *Ang, p* 158, *ll* 11-22 *App* 8GG). Squires did not place in his report the time of leaving the Motel 6 scene. (*S, p* 136, *ll* 16-18; *App* 10FF ). Cotton was put in Bowen's cruiser. (*S, p* 45, *ll* 21-22; *App* 10E ). Bowen took Cotton to the Windsor Locks police department to be fingerprinted and photographed. (*S, p* 84, *ll* 16-20; *App* 10T ). Squires did not place in his report the time of arrival at the Windsor Locks police station. (*S, p* 136, *ll* 19-21; *App* 10FF ). Cotton never spoke to Bowen during the ride in the cruiser from the Motel 6 scene to the Windsor Locks police station. (*B, p* 83, *ll* 21-24; *App* 5Y ). Cotton never made it into the booking area. (*S, p* 87, *ll* 10-14; *App* 10U ).

**Additional Delay and the employment of unnecessary force at the station**: Bowen , once within the sally-port at the station, took Cotton out of the cruiser. Bowen observed Cotton chewing. (*B, p* 86, *ll* 6-17; *App* 5AA ). Bowen told Cotton to spit out whatever he had in his mouth or else be sprayed with Mace. (S, *p* 90, *ll* 10-14; *App* 10V ). Bowen maced Cotton in order to get him to spit out whatever was in his mouth. (*B, p* 88, *ll* 16-17; *App* 5BB; *Ang, p* 152, *ll* 1-3; *App* 8EE ). Angell was under the impression that the

Mace was employed to assist Cotton in spitting, because he appeared to be choking on the contents within his mouth. (*Ang, p* 152, *ll* 1-3; *App* 8EE ). Squires could not remember Cotton saying anything to Bowen before the mace was deployed. (S, *p* 125, *ll* 12-13; *App* 10DD ).  The mace was not used for any reason related to officer safety. (S, *p* 101, *ll* 8-21; *App* 10AA ). The use of mace on a handcuffed prisoner was out of the ordinary. (S, *p* 130, *ll* 1-3; *App* 10EE ). Squires acknowledged that, at the time of the macing, the officers were dealing with a handcuffed prisoner who had not displayed any physical threatening gesture. (S, *p* 90, *ll* 1-9; *App* 10V ). Squires acknowledged he had the responsibility to correct any of Bowen's behaviour that was recognized to be improper.  (S, *p* 93, *ll* 5-8; *App* 10X ). Squires admitted that there was nothing in police training that identified Mace as a tool to be used on a handcuffed prisoner to extricate contents from his mouth. (S, *p* 92, *ll* 10-15; *App* 10W ). Squires had never maced a handcuffed prisoner. (S, *p* 98, *ll* 19-21; *App* 10Y ). Squires had never seen a handcuffed prisoner maced for the purpose of getting him to spit out drugs. (S, *p* 99, *ll* 7-9; *App* 10Z ). The macing of Cotton, while he was handcuffed, for the purpose of having him spit out drugs, was a first for Squires. (S, *p* 99, *ll* 10-11; *App* 10Z ).

Bowen pointed the Mace at Cotton's face. (*B, p* 92, *ll* 17-18; *App* 5DD ).Bowen sprayed Cotton on the face for one or two seconds. (*B, p* 85, *ll* 8; *App* 5Z ). Bowen could see the wetness from the Mace on Cotton's face. (*B, p* 93, *ll* 13-15; *App* 5EE ). Bowen sprayed Cotton a second time with the Mace. (*B, p* 85, *ll* 9; *App* 5Z ). Bowen knew that Mace was an irritant, which caused difficulty with breathing. (*B, p* 89, *ll* 18; p 90, ll 17-19; *App* 5CC ). There was nothing in Bowen's training, or his experience as a police officer, that identified Mace as an acceptable technique for getting a handcuffed prisoner

to spit out drugs. (*B*, *p* 88, *ll* 19-22; *App* 5BB ). Angell confirmed there was nothing in training or usual police practices that identified as acceptable, the application of mace to a handcuffed prisoner for the purpose of extracting drugs from his mouth. (*Ang*, *p* 159, *ll* 11-16; *App* 8HH ).

After the second application of Mace, Squires placed Cotton on his knees. (S, *p* 116, *ll* 12-13; *App* 10CC ). Squires began spraying Cotton down with a water hose. (*S's Rep*. 2d par; *App* 11A). The ambulance was dispatched during the time that Squires was hosing Cotton down. (S, *p* 116, *ll* 1-7; *App* 10DD ). The ambulance took about three minutes to arrive, after receiving the call from dispatch. (*Ak*, *p* 33, *ll* 18-21; App 2G). Squires was still hosing Cotton down when the ambulance arrived. (S, *p* 116, *ll* 5-7; *App* 10CC ).

The decision to request an ambulance through the police dispatcher was based upon nothing more than defendants' observation that Cotton was still chewing. (*B*, *p* 98, *ll* 20-22; *App* 5FF ). The claimed significance of the observed chewing lay in an implication, made by Bowen, that Cotton was concealing an unknown quantity of drugs in his mouth, but clearly enough to require hospitalization. (*B*, *p* 99, *ll* 1-5, 10-14; *App* 5GG ).

Stan Akesson was working for Windsor Locks Lions Ambulance, on the 6 pm to 6 am shift, when the call for an ambulance came in from the Windsor Locks police department. (*Ak*, p 12, *ll* 12-14, 22; *App* 2B). Mr Akesson was a licensed paramedic. (*Ak*, p 10, *ll* 17-21; *App* 2A ). Akesson's source of full time employment was as an "operational supervisor" with American Medical Response. (*Ak*, *p* 14, *ll* 10-15; *App* 2C ). Mr Akesson did not know any of the defendant officers. (*Ak*, *p* 21, *ll* 21-25; thru *App*

2D; *p* 22, *ll* 1-2; *App* 2E ). Akesson knew the Chief of the Windsor Locks Police department because the latter had once served as a "scheduler" for American Medical Response. (*Ak, p* 22, *ll* 5-9,13, 22; *App* 2E ). Akesson recalled that upon arrival Cotton was handcuffed behind his back and situated between Bowen and Squires. (*Ak, p* 36, *ll* 9-18; *App* 2I ). Akesson tried to approach Cotton but was prevented. Akesson was directed by Bowen and Squires to stand back. (*Ak, p* 45, *ll* 17-23; *App* 2L ). Akesson observed that Cotton was wet, the floor was wet, and there was a hose out. (*Ak, p* 62, *ll* 17-18, 22; *App* 2S ).

One of the two officers, on the scene, provided to Akesson most of the explanation concerning the underlying events. This officer was the shorter of the two and appeared to have been the one who had first come upon Cotton. (*Ak, p49, ll* 4-14; *App* 2M ). Akesson was told that the hosing down of Cotton had been an attempt to try and remove bags of drugs that Cotton had been observed swallowing. Akesson was incapable of summoning any logic, derived from either training or experience, that would satisfactorily identify how hose water could be used to retrieve objects thought to have been swallowed. (*Ak, p* 63, *ll* 19-25; *App* 2T). Based upon what he was told, Akesson had every reason to believe that the bags Cotton had tried to swallow remained unextricated. (*Ak, p* 76, *ll* 1-20; *App* 2V). Cotton was incapable of speaking throughout the time that Akesson was on the scene. (*Ak, p* 35, *ll* 8-15; *App* 2H ).

Akesson was not told that the hosing down of Cotton was an attempt to relieve from the burning effects of the Mace. (*Ak, p* 76, *ll* 1-8; *App* 2V). The claim that the police hosed Cotton to provide relief was not disclosed to Akesson until a later point in time - after learning that Mace, in fact, had been employed. (*Ak, p* 78, *ll* 7-13, 17; *App*

2X ). Akesson was asked by the police to provide a voluntary statement. (*Ak, p* 56, *ll* 11-17; *App* 2Q ). Akesson was at the Hartford Hospital with Cotton, at the time he was requested to provide a voluntary statement. . (*Ak, p* 58, *ll* 7-9; *App* 2R ). Akesson, at the time of providing his voluntary written statement did not know that Bowen had maced Cotton. (*Ak's rep, p* 1 of 3, *App* 3A ). There was nothing in Cotton's appearance that alerted Akesson to the fact that Mace had been employed. (*Ak, p* 77, *ll* 18-21; *App* 2W ). Akesson's statement recorded that "one of the officers said, 'they used water to try and get whatever he swallowed out.'" (*Ak's rep, p* 1 of 3, *ll* 17; *App* 3A).

Akesson estimated he was at the sally-port for twelve minutes when Cotton fell to his knees and collapsed from cardiac arrest. (*Ak, p* 74, *ll* 10-17; *App* 2U). There was a subsequent three to four minute interval during which time Akesson was permitted to place Cotton on a stretcher and remove a white bag from his throat. (*Ak, p* 43, *ll* 24-25; *App* 2J; thru *p* 44, *ll* 1-4; *App* 2K ). The extrication of this bag led Akesson to conclude that Cotton had been choking the entire time he had been in police custody. (*Ak, p* 85, *ll* 12-14; *App* 2Z ). Akesson became concerned that the Ambulance Run sheet, he was required to fill out, might become a source document for criticism of the Windsor Locks police. (*Ak, p* 84, *ll* 11-15; *App* 2Y ). Akesson acknowledged that he was not confused when he filled out the run sheet chart. (*Ak, p* 92, *ll* 11-19; *App* 2BB ). Akesson acknowledged that he had the appropriate knowledge and adequate time to fill out said chart. . (*Ak, p* 92, *ll* 16-19; *App* 2BB). Akesson knowingly deviated from charting protocol in filling out the run sheet. Akesson refrained from identifying, on the run sheet chart, that Cotton's "mechanism of injury" was "ingestion" even though there was a place provided for this information. (*Ak, p* 92, *ll* 2-25; *App* 2BB ). Akesson, on this chart,

reported that Cotton used inappropriate words when in fact Cotton made no response.
(*Ak, p* 94, *ll* 19-25; *App* 2CC; *p* 95, *ll* 1-8; *App* 2DD; See also, *Zim rep, p* 1 of 4, *ll* 16-17; *App* 4A). Akesson described Cotton as demonstrating "abnormal flexion or abnormal extension" when in fact he knew accuracy required him to record that Cotton made "no response" because he was lying supine on the floor and not moving. (*Ak, p* 97, *ll* 4-17; *App* 2EE). Akesson acknowledged he incorrectly described Cotton in the run form as having "dilated pupils". (*Ak, p* 101, *ll* 4-6, 13; *App* 2GG ) Akesson could not remember whether Cotton's eyes were open, much more, whether he checked to see if they were reactive to light. (*Ak, p* 100, *ll* 19-24; *App* 2FF ). Akesson circled a box on the run sheet that said "No" for cardiac arrest despite the fact this was not accurate. (*Ak, p* 29, *ll* 5-15; *App* 2F ). Akesson failed to preserve any cardiac monitor strip demonstrating that Cotton had an erratic heart beat ("v-fib") despite knowing that standard of care required same in order to justify application of electric shock. . (*Ak, p* 87, *ll* 14-25; *App* 2AA ). Akesson was incapable of explaining why he falsified his entry of time for when Cotton was determined to have been found asytolic. . (*Ak, p* 84, *ll* 11-15; *App* 2HH ).

Kelly Zimmer was working with Akesson as an intermediate EMT. (*Zim rep, p* 1 of 4, *ll* 3-4; *App* 4A). Zimmer attached the leads from the heart monitor to the patient. (*Zim rep, p* 2 of 4, *ll* 8-9; *App* 4B ). Akesson- in Zimmer's report- found no heart beat and confirmed there were no respirations. (*Zim rep, p* 2 of 4, *ll* 9-10; *App* 4B ). The ambulance personnel then proceeded with "asystole protocols" and advised Bowen to drive the ambulance to the Hartford Hospital. (*Zim rep, p* 3 of 4, *ll* 11-12; *App* 4C).

**Defendants are without credible justification for use of dog**: There are two conflicting

explanations that Defendants have published as justification for directing Niko to bite

Cotton:

<u>One version</u> is identified by Akesson, the paramedic who tried to shield the Windsor

Locks police officers through fabrication of information on the ambulance run sheet.

Akesson quoted Bowen as saying that Cotton had attempted to run away at the Motel 6

scene. (*Ak, p* 51, *ll* 8-16; *App* 2N ). In this version, Bowen reported that, as Cotton was

running away, he was swallowing bags of crack. (*Ak, p* 52, *ll* 13-17; *App* 2O). Bowen

was described as having said that, the reason the dog was employed, was because Cotton

tried to run. (*Ak, p* 51, *ll* 17-19; *App* 2N ). Akesson testified that, as Bowen was relating

these details,  Squires chimed in and confirmed Cotton's swallowing of drugs, his

running, and then his being chased by the police canine. (*Ak, p* 53, *ll* 4-13; *App* 2P ).

Bowen, at his deposition, flatly denied ever telling anyone that Cotton had attempted to

run away or that Nico had been used to stop Cotton from running away. (*B, p* 73, *ll* 11-

13, 16-18; *App* 5S ).

<u>The second version</u> was provided, in verbal stutter-step, by Angell and Bowen

during the conduct of their respective depositions. Bowen, after making the decision to

arrest Cotton, at the Motel 6, directed the latter to lay on the ground. (*B, p* 64, *ll* 18; *App*

5N ). Bowen testified that, at this time, Cotton placed his hands underneath him. (*B, p* 64,

*ll* 19; *App* 5N ). This becomes an important point because of the critical contrast it

provides with Angell. What is critical (as shall be developed), in this aspect of Bowen's

recitation, is that the direction for Cotton to lay on the ground comes *after* making the

decision to arrest. Angell, however, recalls that Cotton, while kneeling was asked to put

his hands behind his back. (*Ang, p* 84, *ll* 11-12; *App* 8G ). Angell claims that Cotton

responded to this request by making a sudden move with his hands to the front of his

waistband. (*Ang, p* 87, *ll* 10-15; *App* 8I ). Angell claims that both defendants, Angell and

Bowen, responded to this sudden move by pushing Cotton to the ground. (*Ang, p* 85, *ll*

21-24; *App* 8H ). Angell claims that they push Cotton to the ground because his sudden

move inspired a fear of personal harm. (*Ang, p* 183, *ll* 6-11; *App* 8II ). This materially

contradicts Bowen. Angell's justification for pushing Cotton to the ground perforce

identifies a point in time prior to the defendants' decision to make an arrest. This can be

demonstrated because as Angell develops this scenario, he makes clear that the dog bite

occurs after Cotton is pushed to the ground. While each of the defendants agree that

Cotton ends up on the ground, Angell's sequencing identifies Cotton's placement on the

ground as having occured pre-arrest while Bowen's version places Cotton on the ground

after the decision to arrest is made. Angell, in his earlier testimony agreed that after Niko

bit, Cotton screamed, a chunk flew out and landed on Bowen's arm. This chunk is what

was tested, found to be crack and culminated in Bowen's decision to arrest Cotton. (See p

7 <u>supra</u>; *Ang, p* 114, *ll* 25; *App* 8Q; p 115, *ll* 1; *App* 8R; p 117, *ll* 6; *App* 8T ).

Angell's version, claiming a pre-arrest push of Cotton to the ground, has Bowen on

top of Cotton. Angell thought Bowen might have been kneeling on Cotton. (*Ang, p* 89, *ll*

4-8; *App* 8J ). Bowen denied ever kneeling on Cotton's back. (*B, p* 69, *ll* 22-24; *App* 5P

). Bowen could not conceive of a reason that would have prompted a need to kneel on

Cotton's back. (*B, p* 70, *ll* 4-6; *App* 5Q ). Angell, gives voice to a "struggle" to describe

Bowen's unsuccessful efforts to get Cotton's hands out from underneath his stomach.

(*Ang, p* 108, *ll* 10-12, 14-17; *App* 8N ). Angell's, written report, never referred to

Bowen's unsuccessful attempts to physically remove Cotton's hands. (*Ang's rep*, *p* 1, *ll* 22; *App* 9A ). Bowen, in his report, only referred to grabbing Cotton's jaw in order to get his mouth open, and then "yelling for Cotton to open his mouth...". (*B's rep*, *p* 3 of 4, *ll* 5-8; *App* 6C ).

Bowen, in his report, described Cotton as "face down on the ground." ...". (*B's rep*, *p* 3 of 4, *ll* 5; *App* 6C ). Bowen reiterates, during his deposition, that Cotton's chest and stomach were on the ground but he was keeping his head raised. . (*B*, *p* 69, *ll* 14-16; *App* 5P ). Angell, in his deposition, claims that Cotton was scrunching sideways in a fetal position. (*Ang*, *p* 102, *ll* 14-17; *App* 8L ). Angell acknowledges that there is nothing in his report that employs a description that would reasonably communicate an effort by Cotton to get into a fetal position. (*Ang*, *p* 111, *ll* 13-18; *App* 8P ).

Angell admits that he gave Niko a bite command. (*Ang*, *p* 102, *ll* 18-21; *App* 8L ). Bowen never heard the command. (*B*, *p* 65, *ll* 8-11; *App* 5O ).  Angell claims that Cotton was bitten once, in the upper shoulder. Angell explained that the upper shoulder was the only viable location for a bite. (*Ang*, *p* 102, *ll* 24-25; *App* 8L ). Angel claimed to have targeted Nico for the shoulder. (*Ang*, *p* 109, *ll* 10-16; *App* 8O ).  Angel testified that when the bite occurred he still controlled Nico by the collar. (*Ang*, *p* 107, *ll* 12-13; *App* 8M ). Angell emphasized that his hold over Nico would preclude any opportunity for more than one bite. (*Ang*, *p* 107, *ll* 16-21; *App* 8M ).

Bowen says that, at this time, he had a clear and unobstructed view of Cotton, Nico, and Angell. Bowen never saw Nico bite Cotton. (*B*, *p* 72, *ll* 5-23; *App* 5R ). Bowen claims he became aware that Cotton had been bitten after the arrest. (*B*, *p* 72, *ll* 23-25;

*App* 5R ). Bowen never mentions, anywhere in his written report, that Angell's attack

trained canine has been employed upon Cotton. (*B's rep*; *App* 6A-6D).

Chief Suchocki, of the Windsor Locks police department, informed Angell, at a later

date, that there were multiple dog bites. (*Ang, p* 107, *ll* 6-7; *App* 8M ). The post morten

examination, carried out by the Office of the Chief Medical Examiner, revealed and

diagnosed canine bite marks on the right side of Cotton's face and on the left anterior

aspect of his upper leg. (*ME rep, p* 6; *App* 14F).

Cotton's decision to suddenly offer resistence comes at a time when he is on his

knees. An odd tactical choice. He is in the position universally acknowledged to be a

signal of ultimate subservience. He is in the presence of two armed officers. He is

confronting an attack trained canine. The Defendants' contention that Cotton would pick

this point in time to suddenly offer resistence is peculiarly out of step with his passivity

up until then. Bowen, reported to Squires, upon the latter's arrival at the Motel 6 scene,

that there had been no difficulty in getting Cotton out of the van. (*S, p* 43, *ll* 17-20; *App*

10D). Bowen acknowledged that Cotton offered no resistance to the conduct of the

patdown. (*B, p* 45, *ll* 5-7; *App* 5G ).Up to the point that Cotton spit, he was not perceived

to have engaged in any activity that represented a threat to the personal safety of either

Bowen or Angell. (*B, p* 62, *ll* 10-14; *App* 5L ). Bowen clarified that he did not perceive

the spitting to be an act of defiance of a threat to officer safety. . (*B, p* 62, *ll* 15-19; *App*

5L ).The "use of force" report Bowen subsequently filed, after Cotton had been taken to

the Hartford Hospital in a state of cardiac arrest, affirmatively recorded that Cotton had

not resisted arrest. (*B's cap*; *App* 7A ). Angell's contention that he felt imperiled, by

Cotton's sudden hands move to the front waistband, is out of step with Bowen's report.

More significantly, Angell is out of step with his own testimony. Angell could muster no recollection of ever suffering the bother to check Cotton's waistband after handcuffing was completed. (*Ang, p* 125, *ll* 5-11; *App* 8W ). Angell, before he is through with his deposition, seems to sever connection between his order directing Nico to bite Cotton, and the "freeing" of Cotton's arms. Angell, without felt need for clarification, obliquely informs that the bite command was not issued to free Cotton's arms but was used as a tool to place him under arrest. . (*Ang, p* 124, *ll* 21-23; *App* 8V ).

**Preliminary Conclusion before discussion of law:**

Probable cause to arrest Cotton for possession of drugs was fairly established at the point in time that Bowen acknowledged to Angell having seen an attempted ingestion of drugs. This is before Cotton is placed on his knees. The attempted ingestion occurs after having interpreted Cotton's appearance - of having passed out,  from a "cause" prominently displayed on his shirt front, - as the profile of one who had been snorting cocaine. The attempted ingestion occurs after the van has been searched with resultant findings of "small white fragments on the driver's seat and on the floor in between the seats". (*B's rep, p* 2 of 4, *ll* 32-33; *App* 6B ). The testing of any one of these fragments, in Bowen's words, was merely a matter of seconds. (*B, p* 63, *ll* 17-18; *App* 5M ). The immediate summoning of an ambulance, at or around the time of having observed Cotton ingest what was believed to be crack cocaine, would have served both plain medical sense as well as the ends of proper law enforcement. The officers could have obtained, through proper process, custody over whatever was ultimately removed by medical staff, from Cotton's stomach or throat. Alternatively, Cotton's medical records would have been available together with the pathology reports that would, inexorably, have been a

part of the extrication process employed by medical personnel to preserve and secure his life. Bowen's apparent justification for postponing the summoning of medical assistance - the need to prevent Cotton from destroying evidence- was nothing less than flat defiance of both defendants' acknowledged training and experience.  Even this specious justification disappears after Bowen field tests the expectorated chunk and determines it to be crack cocaine. Delay in summoning medical assistance at this point is, as Angell's testimony establishes, a conscious disregard of a recognized need to summon medical assistance. The employment of mace and water as further attempts to extricate drugs is a disgrace to decency.

The defendants sponsor two conflicting justifications for employing the attack canine: (1) The dog was ordered to bite because Cotton refused to remove his hands from underneath his body; (2) the dog was ordered to put a stop to Cotton's attempted flight from the officers.

The physical evidence established by the Medical Examiner's office is irreconcilable with Angell's claim that there was one controlled bite directed at Cotton's shoulder. The leg wound inflicted by the canine would be more consistent with the "attempted flight" version Akesson testified had been reported to him by Bowen. Bowen and Angell have both, in their sworn depositions, disavowed the "flight" version. Bowen, despite an unobstructed line of sight claims never to have seen Niko bite. Bowen's testimony would establish that any bite that did occur was an event that took place before the decision to arrest had been made. Angell, although acknowledging that the basis for arrest was the positively tested chunk which was spit onto Bowen's sleeve,  forgets -

during the heat of deposition - that the spitting had to have occurred before Cotton was pushed to ground.

If neither proferred justification for the use of the attack dog is entitled to credible weight; And they are the only justifications, articulated by the defendants, for the use of canine force; Then there is no credible justification for the use of the dog. Perforce, there would have to be a conclusion that the use of the dog was excessive.

### THE DOCTRINE OF QUALIFIED IMMUNITY DOES NOT SHIELD THE DEFENDANTS EMPLOYMENT OF EXCESSIVE FORCE BASED UPON THE FACTS AND CIRCUMSTANCES OF THIS PRESENTATION

Qualified immunity is only a defense to an excessive force claim where: the law did not put the defendant officer on notice that his conduct would be clearly unlawful; Saucier v. Katz, 121 S. Ct. 2151, 2156 (2001); or, in the case of clearly established law, if it was *objectively reasonable* for the defendant officer to believe that his or her acts were lawful. Schnabel v. Tyler, 230 Conn. 735, 747 (1994). The Defendants' Memorandum initially appears to concede, as clearly established law, "the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness."[*] (*Def's memo*, p 11). However, Defendants subsequently contend, without benefit of citation or clear explication, that "Plaintiff's Claimed Fourth Amendment Violations Are Not clearly Established Rights". (*Def's memo*, p 13).

> The Fourth Amendment, by its very terms, sets the constitutional limit on the amount of force an officer may use while making an arrest ...
>
> **Lester v Chicago**, 830 F2d 706, 710 (7th Cir. 1987) (quoting **Bell v**

---

[*] *Def's Memo* = Defendant's Memorandum of Law in Support of Motion for Summary Judgment, dated 12/30/02

HUNT LEIBERT CHESTER & JACOBSON, P.C. ● ATTORNEYS AT LAW
50 WESTON STREET ● HARTFORD, CONNECTICUT 06120 ● (860) 808-0606 ● JURIS NO. 101589

**Wolfish**, 746 F2d 1278 n. 87 (7th cir 1984).

Defendants' attempt, to span the inconsistency, between their concession and their contention, appears to be premised on  misconceptions of both law and fact - each of which are discussed in turn.

Defendant's erroneous claim of law is that Plaintiff's complaints of "excessive force" are governed by the substantive due process standards applicable under the 14th amendment.

> ...*all* claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process", must be the guide for analyzing these claims. ...
>
> (T)he "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. ... An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

> **Graham v Connor**, 490 US 386, 395 (1989).

Plaintiff's reference to the Fourteenth Amendment in his complaint is merely an iteration of the holding in **Mapp v Ohio**, 367 US 643,655 (1961) that the federal guarantees of the Fourth Amendment are enforceable against the States.

 The Defendants look for succor from **Saucier v Katz**, 121 S Ct 2151 (2001). The Defendants find in **Saucier**, a suggestion that the "contours" of an excessive force

complaint under the Fourth Amendment require "a higher degree of specificity" whenever a defense of qualified immunity is raised. (*Def's memo*, p 11). Defendants then, without so much as inhaling, conclude that the next logical step in analysis requires assessing whether the "officers (were) subjectively deliberately indifferent to Cotton's rights..." (*Def's memo*, p 12).

Defendants have taken the **Saucier** "specificity lens", and applied it to Plaintiff's complaint to achieve an analytical alchemy transmuting the "objectively reasonable" standard of **Graham**, into a subjective standard, only appropriate for due process claims arising under the Fourteenth Amendment.

Justice Kennedy's decision in **Saucier v Katz**, 121 S Ct 2151 (2001) held that a ruling on qualified immunity requires an analysis "not susceptible of fusion" with the question of whether unreasonable force was used in making the arrest. Justice Kennedy observed that the **Saucier** case:

> was presented to the Court of Appeals on the assumption that respondent's seizure and brief detention ... did not violate the Fourth Amendment right to be free from arrest without probable cause, as distinct from the force used to detain.
>
> **Saucier v Katz**, 121 S Ct 2151;
> 2001 WL 672265, III p 8(2001).

The instant claim, raised by the Estate of Cotton, as was true of the posture **Saucier** presented to Justice Kennedy, does not question that the defendants had the right to arrest Cotton.

> The sole question then, is whether the force used violated a clearly established Fourth Amendment protection so that petitioner was not entitled to immunity.

**Saucier v Katz**, 121 S Ct 2151;
2001 WL 672265, III p 8(2001).

Justice Kennedy's effort in **Saucier**, to address this "sole question" was ostensibly an

explication- not an overruling- of **Graham v Connor**, 490 US 386, 109 S Ct 1865, 104

LEd2d 443 (1989). Justice Kennedy acknowledged that:

> In **Graham**, we held that claims of excessive force in the context of
> arrests or investigatory stops should be analyzed under the fourth
> Amendment's "objective reasonableness standard", not under substantive
> due process principles. 490 US at 388, 394, 109 S Ct 1865.

**Saucier v Katz**, 121 S Ct 2151;
2001 WL 672265, II p 7(2001).

Justice Kennedy  acknowledged that **Graham** set forth a "list of factors" relevant to

assessing the merits of a constitutional excessive force claim:

> requiring careful attention to the facts and circumstances of each particular
> case, including the severity of the crime at issue, whether the suspect
> poses an immediate threat to the safety of the offices or others, and
> whether he is actively resisting arrest or attempting to evade arrest by
> flight.

**Saucier v Katz**, 121 S Ct 2151;
2001 WL 672265, II p 8 (2001).

Justice Kennedy then reasoned that a qualified immunity inquiry had a further dimension:

> the concern of the immunity inquiry is to acknowledge that reasonable
> mistakes can be made as to the legal constraints on particular police
> conduct. ... If the officer's mistake as to what the law requires is
> reasonable, however, the officer is entitled to the immunity defense.

**Saucier v Katz**, 121 S Ct 2151;
2001 WL 672265, II p 8 (2001).

Justice Kennedy's discovery of a  "further dimension" implied by the phrase, "qualified

immunity", does not appear to have extended beyond merely identifying a "concern" .

The identified "concern" was that an officer might make a *reasonable* mistake in

attempting to fathom "the sometimes hazy border between excessive and acceptable force." **Saucier v Katz**, 121 S Ct 2151; 2001 WL 672265, II p 8 (2001). There is nothing in Justice Kennedy's opinion that serves to innervate Defendants' contention that an assessment of qualified immunity, now requires accounting for the subjective state of the officer.

Justice Ginsburg makes this clear in her concurring opinion while politely, but effectively, skewering Justice Kennedy's "discovery" of another dimension:

> *The Court today tacks on to a **Graham** inquiry a second, overlapping objective reasonableness inquiry* purportedly demanded by qualified immunity doctrine. The two-part test today's decision imposes holds large potential to confuse. Endeavors to bring the Court's abstract instructions down to earth, I suspect, will bear out what lower courts have already observed -- paradigmatically, the determination of police misconduct in excessive force cases and the availability of qualified immunity both hinge on the same question: Taking into account the particular circumstance confronting the defendant officer, could a reasonable officer, identically situated, have believed the force employed was lawful?
>
> > **Saucier v Katz**, 121 S Ct 2151;
> > 2001 WL 672265, Concurring
> > Opinion, p 10 (2001). *(emphasis added)*

Justice Kennedy's disposition, in **Saucier**, addressed a claim of excessive force, which described a "gratuitously violent shove". The complained of "shove" occurred during the course of an arrest and placement into a police van. Arrest and placement in the van was not challenged. Justice Kennedy's disposition, from inside the "further dimension" of qualified immunity, appears to have been nothing more than a critique employing **Saucier's** "list of factors" to assess "the merits of the constitutional excessive force claim":

A reasonable officer in petitioner's position could have believed that hurrying respondent away from the scene, where the Vice President was speaking and respondent had just approached the fence designed to separate the public from the speakers, was within the bounds of appropriate police responses.

Petitioner (police officer) did not know the full extent of the threat respondent posed or how many other persons there might be who, in concert with respondent, posed a threat to the security of the Vice President. There were other potential protestors in the crowd, and at least one other individual was arrested and placed into the van with respondent. In carrying out the detention, as it has been assumed the officers had the right to do, petitioner was required to recognize the necessity to protect the Vice President by securing the respondent and restoring order to the scene. It cannot be said there was a clearly established rule that would prohibit using the force petitioner did to place respondent into the van to accomplish these objectives.

> **Saucier v Katz**, 121 S Ct 2151;
> 2001 WL 672265, III p 9 (2001).

The Defendants are also erroneous in claiming that the Second Circuit has not clearly decided whether the **Graham** standard of objective reasonableness applies to pre-arraignment detainees. (*Def's memo*, p 13).

The **Graham** court declined to decide "whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins." In **Calamia v City of New York**, 879 F2d 1025, 1034-35 (2d cir 1989), we ruled that **Graham** required use of the objective Fourth Amendment standard to the claim of a plaintiff who complained that after his arrest he had been forced to remain on the floor of his home, with his hands handcuffed tightly behind his back for six hours while six policemen collected property covered by a search warrant. We think the Fourth Amendment standard probably should be applied at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer.

> **Powell v Gardner**, 891 F2d 1039,
> 1044 (1989).

At least two courts in the Second Circuit have interpreted **Powell** ... to require application of the Fourth Amendment at least until plaintiff's

pretrial custody status is ordered by a judicial officer, as upon arraignment resulting in an order of pretrial regulatory detention or the setting of bail conditions. See **Blake v Base**, No 90-CV-0008, 1998 WL 642621, at *11 (NDNY 9/14/98)(analyzing claim of excessive force arising out of treatment following arrest, prior to arraignment, under the Fourth Amendment); **Freece v Young**, 756 F Supp 699, 703 (WDNY 1991) applying Fourth Amendment to an arrestee's claim that he was denied medical treatment). In addition, a majority of circuits currently favor the Fourth Amendment over the Fifth or Fourteenth Amendment to govern analysis of "conduct that occurs after the initial seizure or arrest, but before a formal hearing before a neutral judicial officer." **Pyka v Village of Orland Park**, 906 F supp 1196, 1220 (ND Ill 1995).

> **Thompson v City of Meriden**, 1999 WL 301693 at *5 (1999).

The **Blake** case, cited in **Thompson**, did note that there are "several district courts" within the Second Circuit which have held that the Fourteenth Amendment standard remains applicable to excessive force claims brought by pretrial detainees. The **Blake** court accused these decisions of ignoring a line drawn by the Second Circuit. The **Blake** court noted that in "none of those cases did the courts focus on the plaintiff's status -that is whether the plaintiff was arrested or seized." **Blake v Base**, No 90-CV-0008, 1998 WL 642621, at *11 (NDNY 9/14/98).

There are components of Plaintiff's claim which assert Fourth Amendment violations for recklessly enhancing or creating the liklihood of death and/or failing to summon medical assistance. See, *Plaintiff's Amended Complaint*, 7/10/02, *Count Two, Par. 19 (d), (e) and (f)*. These components do not change the appropriate standard of "objective reasonableness" to one that depends upon the subjective state of the Defendants' mindset. The Defendants' suggestion that the Second Circuit is undecided about whether the appropriate standard, should be a "subjective or objective one", ( see, *Def's memo, p* 13), for this component of Plaintiff's claim,  is -at best- a misreading. The